IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TONY GOLDEN, | CV 12–190–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| NORTHWESTERN CORPORATION, a Delaware corporation d/b/a NORTHWESTERN ENERGY, | |
| Defendant. | |

Plaintiff Tony Golden filed this wrongful discharge action against NorthWestern Corporation, his former employer, in the Montana Fourth Judicial District, Missoula County in October of 2012. NorthWestern removed the case to this Court the following month. Golden asserts claims under the Montana Wrongful Discharge from Employment Act, Mont. Code Ann. § 39-2-904(1)(b) and (c), alleging that his termination was not for good cause and was in violation of the express provisions of NorthWestern's written personnel policies.[1]

---

[1] Plaintiff also filed a claim for negligence, which the Court has dismissed. (Doc. 10.)

In its motion now before the Court, NorthWestern claims it is entitled to complete summary judgment on all remaining claims, contending that Golden was terminated because he was using company time and resources for his own personal real estate business, and because he received, stored, and transmitted numerous pornographic videos and photos via his company email using his company computer. Both of these actions violate company policy. Golden counters that summary judgment is inappropriate because there are significant questions of fact associated with the rationale provided for his termination, NorthWestern's failure to follow its written policy, and the disparity of treatment between himself and similarly situated NorthWestern employees.

The Court will grant NorthWestern's motion and dismiss this case in its entirety for the reasons stated herein.

## I. Factual Background

Tony Golden worked in the Lands and Permitting Department at NorthWestern Energy, and was assigned to work from the company's Missoula office. Pat Asay served as Golden's supervisor. During his time at NorthWestern, Golden underwent numerous training sessions on, and was otherwise exposed to, various company policies. Most relevant to this case are the "Code of Business Conduct and Ethics" ("Code" or "Code of Conduct") and the "Acceptable Use of

Internet, Networks, and Intranet" policy. The relevant portions of these policies are discussed at length below.

In 2006, Golden was reprimanded for using his company computer to engage in his outside private business as a real estate broker. He met with Asay and representatives from HR regarding the incident, and Asay issued a written warning "under the Progressive Discipline Policy for violations of NWE's work performance and Code of Conduct Standards," stating that "[o]ther than incidental items, [Golden] must not conduct personal business at work or use company equipment for personal use." (Doc. 25-5 at 5-6.) Asay informed Golden that "[i]f your performance issues are not addressed you will be subject to further discipline, up to and including termination from employment." (*Id.* at 6.)

Golden continued to engage in his personal business using company equipment, which came to NorthWestern's attention in 2012 when a non-employee informed the company's Human Resources ("HR") department that Golden was misusing company time and/or resources. NorthWestern conducted an investigation and found various emails that contained explicit pornographic material. The investigation further revealed that Golden had forwarded sexually explicit videos and photos to other employees, as well as to non-employees. In addition to the pornographic material, NorthWestern found approximately 1,000

personal business emails spanning a 5 month period on Golden's computer.

The company held a termination meeting with Golden in May of 2012, at which time Golden was advised of, and given an opportunity to dispute, the investigative findings. Golden was dismissed after failing to dispute or provide any information to contradict the findings. He was provided the opportunity to appeal his dismissal, as discussed at length below. During the appeals process Golden never provided any information contrary to the investigative findings that resulted in his dismissal. The appeals committee affirmed the decision to terminate Golden's employment with NorthWestern Energy, and Golden brought this action for wrongful discharge.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The movant's burden is satisfied when

the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48. The elements of each claim determine which facts are material. *Id*. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude entry of summary judgment. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

### III. DISCUSSION

Montana's Wrongful Discharge from Employment Act states:

(1) A discharge is wrongful only if:
    (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of

public policy;
>    (b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
>    (c) the employer violated the express provisions of its own written personnel policy.

Mont. Cod. Ann. § 39-2-904. Plaintiff raises claims under subsections (b) and (c). Since the statue is disjunctive, Golden need only succeed on one of his claims for his discharge to be wrongful under the WDEA. NorthWestern seeks summary judgment on the claims raised under both subsections, and the Court will address each in turn.

## A. Golden was Terminated for Good Cause

An employee is wrongfully discharged if "the discharge was not for good cause and the employee had completed the employer's probationary period of employment." *Id.* Golden was a long-term NorthWestern employee, and NorthWestern does not argue that he had failed to complete any probationary period of employment. Thus, the sole question before the Court under this subsection of the WDEA is whether Golden was terminated for "good cause".

"Good cause" is defined as "reasonable job-related grounds for dismissal" based on either: (1) "failure to satisfactorily perform job duties; (2) "disruption of the employer's operation"; or some other (3) "legitimate business reason." Mont.

Code. Ann. § 39-2-903(5). The Montana Supreme Court has defined a "legitimate business reason" as one that "is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Buck v. Billings Montana Chevrolet, Inc.*, 811 P.2d 537, 540 (Mont. 1991). The Court has also consistently reiterated that when "applying this definition we stress the importance of the 'right of an employer to exercise discretion over who it will employ and keep in employment.'" *McConkey v. Flathead Electric Co-op.*, 125 P.3d 1121, 1126 (Mont. 2005) (quoting *Buck*, 811 P.2d at 540). "It is inappropriate for courts to become involved in the day-to-day employment decisions of a business." *Id.* "Of equal importance to this right, however, is the legitimate interests of the employee to secure employment." *Buck*, 811 P.2d at 540. The "balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business." *Morton v. M-W-M, Inc.*, 868 P.2d 576, 579 (Mont. 1994).

In order to "defeat a motion for summary judgment on the issue of good cause, the employee may either prove that the given reason for the discharge is not 'good cause' in and of itself, or that the given reason 'is a pretext and not the honest reason for the discharge.'" *Becker v. Rosebud Operating Services, Inc.*, 191

P.3d 435, 441 (Mont. 2008) (quoting *Johnson v. Costco Wholesale*, 152 P.3d 727, 734 (Mont. 2007)).[2] Golden must present "evidence, and not mere speculation or denial." *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont. 1993).

NorthWestern's "good cause" justification for dismissing Golden is a combination of disruption of its operations and additional legitimate business reasons. Essentially, NorthWestern states that Golden was dismissed because of his use of company time and equipment to facilitate his personal business – behavior that he was previously disciplined for – and because of his receipt, storage, and distribution of pornographic material using his company computer and email address. Both behaviors violate company policy.

### 1. Golden's Receipt, Storage, and Transmission of Pornographic Material Using his Company Computer in Violation of NorthWestern's Express Policy Constitutes Good Cause for Dismissal

It is undisputed that Golden received extensive training related to NorthWestern's various policies, including the company's Code of Conduct, as well as annual ethics training. Golden knew that he was required to abide by the Code of Conduct, and certified that he read and would abide by it. The Code

---

[2] The Court notes that Golden does not have to establish pretext in order to survive summary judgment as to good cause, despite NorthWestern's claims to the contrary on pages 24-25 of its brief, (Doc. 24), and elsewhere. *See Marcy v. Dallas Airlines*, 166 F.3d 1279 (9th Cir. 1999) (holding that "proof that the employer acted in bad faith by using a pretext to discharge its employee is only one possible way of demonstrating that the employer's stated reason was not a legitimate one").

explicitly states that violations of company policy may result in disciplinary measures, including possible termination of employment.

NorthWestern's Acceptable Use of Internet, Networks and Intranet policy states:

> The display of sexually explicit graphics or documents on any NorthWestern Energy computer is a violation of the Anti-Harassment Policy and the Code of Business Conduct and Ethics. In addition, sexually explicit or pornographic materials may not be archived, stored, distributed, edited, or recorded using NorthWestern Energy computers. Use of NorthWestern Energy resources for this type of activity is grounds for immediate dismissal.

(Doc. 25-12 at 4).

After a non-employee contacted the HR department and alleged that Golden was misusing company time and resources, NorthWestern conducted an investigation and discovered emails that included sexually explicit pornographic material. Specifically, the emails contained slide shows of women exhibiting their genitals, images of women engaging in sexual acts with other women, images and videos of women masturbating, striptease slide shows, video of a woman performing oral sex on a man, and graphic videos of sexual intercourse and ejaculation. The investigation also revealed that Golden had used his company email to send sexually explicit materials to other NorthWestern employees, as well

as to people outside of the company. At no point has Golden contested the investigation's findings. He admitted to using "poor judgment" by receiving and transmitting sexually explicit photos and videos through his company email account.

NorthWestern has a legitimate business interest in creating an environment that is free of pornographic material. The mere presence of such material may have a tendency to offend, denigrate, or alienate members of a workforce that has the right to work in an environment free from the various forms that sexual harassment can take. While the mere presence of pornographic material in the workplace arguably gives rise to a legitimate business interest, Golden did not merely use his company computer to access pornographic material, he used his company email account to actively circulate this material to both employees and non-employees alike. While the Court does not have any specific information regarding the employees Golden emailed, it has no difficulty concluding that the circulation of these materials within the workplace enhances the possibility that they could reach an employee to whom they would be offensive or perceived as a form of sexual harassment. Needless to say, the presence and circulation of pornography in the workplace has the potential to expose NorthWestern to liability that it has a legitimate interest in avoiding. NorthWestern also has a legitimate

business interest in preventing pornographic material from being circulated outside of the company through the use of an official company email address. Not only does this behavior have the potential to damage NorthWestern's reputation in the community, it creates potential legal exposure.

Sexual harassment in the workplace is a serious matter and NorthWestern is well within its rights to prevent it using all reasonable means. Pornographic material simply has no place in this work environment, and Northwestern has a legitimate business interest in creating and appropriately enforcing policies to serve this end.

NorthWestern's policy explicitly proscribes the use of company computers for storage and distribution of sexually explicit materials, and just as clearly states that such behavior may result in termination. It is uncontested that Golden used his company computer and company email address to store and distribute pornographic materials. This behavior in and of itself created a legitimate business interest – and thereby good cause under the WDEA – for Golden's termination.

In order to defeat NorthWestern's motion for summary judgment on the issue of good cause, Golden may "either prove that the given reason for the discharge is not 'good cause' in and of itself, or that the given reason 'is a pretext and not the honest reason for the discharge.'" *Becker*, 191 P.3d at 441 (quoting

*Costco*, 152 P.3d at 734). Golden must present "evidence, and not mere speculation or denial." *Kestell*, 858 P.2d at 7.

As an initial matter, Golden does not claim pretext, instead limiting his arguments to lack of good cause. Golden argues that he did not violate anti-harassment policies because he did not actually harass anyone or subject anyone to a hostile work environment, and because none of his fellow employees complained about his possession or distribution of pornographic material. While this may be true, it does not negate NorthWestern's legitimate business interest in creating and enforcing policies that promote a pornography-free workplace. As stated above, NorthWestern's policy clearly prohibits the storage and distribution of this type of materials. Just because this policy falls under the umbrella of the Company's Anti-Harassment Policy does not mean that actual harassment must have occurred for the policy to have been violated and for good cause to exist. This policy was designed to prevent certain harms; those harms need not occur for an employee to be disciplined for violating the policy. It is also worth noting that in the context of sexual harassment, a lack of complaints about an employee's behavior does not necessarily mean that his colleagues were not offended or otherwise negatively impacted. This is a very sensitive and deeply personal topic, and it is certainly conceivable that a coworker might not be comfortable reporting

Golden's behavior despite being offended by it.

Next, Golden argues that his termination was arbitrary and capricious in light of other situations in which similar violations resulted in less severe disciplinary penalties, pointing to the Comparative Disciplinary Actions document that NorthWestern prepared for the benefit of the appeals committee. That report stated that one employee who "had inappropriate and sexually explicit material on his computer" was issued Decision Making Leave ("DML"), and that the employee had no previous disciplinary record. (Doc. 27-3 at 47.) Golden correctly identifies *Johnson v. Costco*, 152 P.3d 727 (Mont. 2007) as the seminal case on the arbitrary application of employment policies. In that case, Costco dismissed Johnson for violating the company's "grazing" policy, which prohibited the consumption of food intended for sale. In reversing the district court's order granting judgment as a matter of law, the Montana Supreme Court held that evidence existed that "may lead a jury to believe that Costco did apply its employment policies arbitrarily" with respect to Johnson. *Costco*, 152 P.3d at 734. The Court cited the fact that "several individuals testified that in the years leading up to Johnson's discharge, many employees had violated the grazing policy repeatedly. Some employees personally admitted as much at trial." *Id.* Additionally, Johnson provided testimony that following his dismissal, employees

still knowingly violated the policy and were not discharged. *Id.*

Golden paints a picture of the culture at NorthWestern where the viewing and circulation of pornography among employees is relatively commonplace. He provides no evidence to support such a claim, but merely references a conversation in which an employee in the IT department alludes to the fact that such material was regularly circulated. Unlike in *Costco*, there is no evidence here that NorthWestern employees routinely violated the policy under which Golden was terminated, either before or after his termination. The single example of an employee who received DML because pornographic material was discovered on his computer does not set a precedent that NorthWestern must follow every time an employee commits a similar violation, lest its alternate course of action be deemed arbitrary. Furthermore, there is no evidence that this employee distributed pornographic material, which Golden admits to doing, and this employee had no previous disciplinary record, which cannot be said for Golden.

The Court finds that Golden's violation of NorthWestern's policy regarding the use of company computers to store and transmit sexually explicit material – in and of itself, regardless of Golden's use of company equipment to conduct his personal business – constitutes good cause for termination under the WDEA. Accordingly, the Court need not reach a decision regarding Golden's personal real

estate business in order to resolve this motion, but it will briefly address that issue nonetheless.

### 2. Golden's Use of NorthWestern's Equipment for his Personal Real Estate Business, Coupled with his Prior Censure for the Same Offense, Constitutes Good Cause for Termination

Relevant to Golden's conducting personal business at work using company equipment, the Code of Conduct provides the following example:

> Q. I have a part-time consulting business on the side. May my consumers contact me during work hours or send messages to my NorthWest Energy e-mail?
>
> A. No. While occasional personal use of company office equipment is allowed if minimal and incidental, using company equipment for a personal business is inappropriate.

In 2006, Golden was formally reprimanded for, *inter alia*, "violat[ing] NWE's Code of Conduct by conducting personal business on company time using company property." (Doc. 27-1 at 5). In the written warning letter, Pat Asay stated, "I have received numerous complaints that you are discussing personal business on company time and/or have occasionally used company property . . . to conduct personal business." (*Id.*) Asay warned Golden that if "your performance issues are not addressed you will be subject to further discipline, up to and including termination from employment." (*Id.*) As to this incident, Golden testified that in

"2006 I believe I was acting inappropriately at work. I was taking advantage of work time. I do believe that my real estate activities did have some interference with my work performance at NorthWestern Energy." (Doc. 27-5 at 7.)

The investigation NorthWestern launched in 2012 following the report from a non-employee regarding Golden's inappropriate use of company time and resources revealed approximately 1,000 personal business emails on his computer, covering a 5 month period. At his deposition, Golden acknowledged the following: (1) he engaged in his businesses while employed at NorthWestern; (2) he used his company email account for corresponding with his clients and as his primary email address; (3) he used his company cell phone as a number to contact him on marketing material; (4) he printed buy/sell agreements from his company computer; and (5) he accessed the Multiple Listing Service through his company computer.

NorthWestern's Code of Conduct explicitly states that the use of company equipment for conducting work related to a personal business is not permitted, and that violation of the policy contained therein could result in discipline, including possible termination. Golden received repeated training on the Code of Conduct, and had already been disciplined for violating this specific policy. He does not contend that any of NorthWestern's investigatory findings were false.

NorthWestern has a legitimate business interest in how its employees use company equipment – and company time – and may reasonably circumscribe certain uses. NorthWestern also had a legitimate business interest in enforcing a policy put in place to achieve such a goal, particularly in situations involving multiple infractions, and where the possibility of termination for such infractions is clearly spelled out in the policy itself. *See Kuszmaul v. Sterling Life Ins. Co.*, 282 P.3d 665, 670 (Mont. 2012).

Golden advances several arguments as to why good cause did not exist, based on what he claims are genuine issues of material fact; he does not allege pretext. Golden first argues that Asay and a HR representative gave him permission to engage in his real estate business on a limited basis while at work, and using company equipment. Specifically, Golden testified that during his 2006 disciplinary proceeding, he told his supervisors and the HR representative that the only way he could eliminate all phone calls and emails related to his personal business would be for him to stop selling real estate altogether. He testified that he was told that he did not have to stop selling real estate, and that based on the meeting, it was his impression that Asay understood and accepted that he would engage in incidental real estate activities while at NorthWestern. Golden points to the written warning letter related to the 2006 censure in which Asay wrote: "Other

than incidental items, you must not conduct personal business at work or use company equipment for personal use. In this regard you acknowledge your understanding of the Code of Business Conduct." (Doc. 27 at 6.) This is essentially a restatement of the Code's language addressing the personal use of company equipment.

Golden relies heavily on the Ninth Circuit's decision in *Blair v. Schwan Food Co.*, 454 Fed.Appx. 553 (2011), to support his argument that NorthWestern's tacit approval of, or at least ambiguous approach to, his use of company equipment for his personal business. Schwan Food Company dismissed Blair for hiring a "lumper," or a non-employee paid in cash to unload a truck, which Blair admitted to. United States Magistrate Judge Carolyn Ostby denied Schwan's motion for a directed verdict and motion for a altered or amended judgment, and the Ninth Circuit affirmed on the basis that evidence existed that could lead a rational jury to believe that Schwan acted arbitrarily in terminating Blair. Specifically, the Court points to Blair's testimony that "his supervisor had emailed written approval of his use of a lumper and that hiring lumpers was a longstanding, common, and condoned practice among Schwan's employees." *Blair*, 454 Fed.Appx. 553, 554 (9th Cir. 2011). In addition to Blair's testimony, his supervisor testified at trial that he had emailed Blair instructions to keep a specific

person "lumping until we get him through the system," and Schwan's HR manager acknowledged that "there had been incidents of lumping within the company in the past." *Id.*

The language from Asay's written warning and Golden's testimony as to what he was told during his 2006 censure meeting does not constitute "permission" to conduct his personal business in the same manner as the email from Blair's supervisor. They amount to nothing more than a reiteration of the Code provision that he was being censured for violating. As Golden himself testified, he was under the impression that all parties understood that "there was going to be some <u>minimal, incidental</u> real estate activities while I was working in Missoula." (Doc. 26 at 15 (emphasis added).) NorthWestern's failure to completely ban Golden from conducting any and all personal business at work demonstrates a level of flexibility and understanding on the part of NorthWestern towards Golden, and does not fall into the same category as the supervisor's explicit instruction to Blair. Additionally, unlike in *Blair*, Golden had been previously disciplined for the same reason that he was ultimately terminated. Finally, in contrast to *Blair*, Golden's termination was not based solely on the behavior which he claims the company approved, but also on his use of company property to store and distribute pornographic materials.

Next, Golden argues that since his 2006 censure was given a 9 month effective date, he could reasonably conclude that passage of the 9 months would "render the disciplinary action irrelevant to his employment status." (Doc. 26 at 19.) This argument is disingenuous and unpersuasive. Although Pat Asay, the author of the written warning that contained the 9 month effective date, could not recall the precise meaning of that provision during his deposition 6 years after the fact, the warning itself clearly states that "[d]uring this period, you will not be eligible for incentive compensation." (Doc. 25-5 at 6.) The effective date does not nullify NorthWestern's ability to take this previous infraction into consideration when deciding how to react to future violations.

As a final point on Golden's ambiguity argument, following his reprimand in 2006, Golden certified on multiple occasions that he understood the Code and that he accepted his responsibility to abide by it. If any ambiguities existed in Golden's mind as to what was and was not appropriate under the Code provision upon which his reprimand was based, he easily could have asked for clarification from the HR department, the legal department, or from a supervisor or manager. The fact that Golden failed to do so undermines his argument that NorthWestern's agents "muddi[ed] the waters" regarding the amount of personal business he was permitted to do at work (Doc. 26 at 14).

Golden's next argument focuses on NorthWestern's determination that he spent a "significant amount of company time and company property to operate his personal real estate business" – essentially that his use of company property exceeded the parameters of the "incidental" use permitted under the Code. Golden calls into question the methodology used to reach this determination, arguing that HR representative Jennifer Rangitsch did not attempt to quantify how much time Golden actually spent on personal business, instead basing her finding on the volume of emails, thus creating a genuine issue of material fact.

The WDEA does not require NorthWestern to conduct an exhaustive quantitative study to determine the precise amount of time Golden spent conducting his personal business in order to justify its finding that he spent "significant time" on that business. The presence of over 1,000 emails spanning a 5 month period, combined with the publication of his company email and phone number in association with his personal business, and taken within the context of his prior violation of the same policy gives rise to good cause. NorthWestern made the decision to dismiss Golden based on considerable, undisputed evidence of repeated misuse of company property that it may properly deem as "significant" without having to prove the point to a jury. This is the type of day-to-day employment decision that is appropriately left to the employer. *See McConkey,*

125 P.3d at 1126 ("it is inappropriate for courts to become involved in the day-to-day employment decisions of a business").

Finally, Golden argues that his dismissal was arbitrary and capricious pursuant to *Costco*, in light of other situations in which similar use of computers and other company property resulted in less severe disciplinary penalties. Golden's argument stretches the *Costco* decision too far. As an initial matter, Golden alleges that several individuals called him to report that they had also used their company computers for personal reasons without consequence. This wholly unsupported claim constitutes hearsay, and is insufficient to create the genuine issue of material fact required to survive summary judgment.

Next, Golden points to the Comparative Disciplinary Actions report, as well as material filed under seal related to a specific NorthWestern supervisor to support his claim of disparate treatment. However, only two of the employees Golden cites who received DML or some lesser form of penalty violated the same policy as Golden. These employees ran separate personal businesses during company hours, and their phone and email records indicated that they spent a substantial amount of time on their personal businesses. However, there is no indication that these employees had been previously disciplined for violating the same policy, nor that any pornographic material was found on their computers.

Even in spite of these distinctions, *Costco* does not require that each violation of

the same policy must be met with the exact same discipline. In that case, the

Supreme Court found an issue of material fact existed based on testimony

regarding "years of violations of Costco's grazing policy by several employees,"

combined with testimony that the policy continued to be violated on a daily basis

following Johnson's dismissal. *Costco*, 152 P.3d 727, 734 (Mont. 2007). Unlike in

*Costco*, there is no evidence of a long-standing or continued failure to enforce the

policy at issue here.

Neither *Costco* nor the WDEA require absolute uniform treatment among

employees for the same or similar acts. Employers must be afforded a degree of

freedom when dealing with each violation of a particular policy. Employers are

permitted to take into account the specifics of each violation, as well as the

differences between employees' records, job responsibilities, and other

individualized characteristics.

On a final note, the Comparative Disciplinary Actions report mentions a

NorthWestern employee who was terminated for running a personal business at

work based on the employee's email and phone records. The employee "had

received a level two discipline after the misuse was initially identified but

continued to run the personal business at work." (Doc. 27-3 at 46.) Of the

incidents contained in the report, this is the most similar to Golden's case.

NorthWestern's decision to terminate this employee further undermines Golden's

argument because it demonstrates in that instance a uniformity of enforcement,

rather than a disparity.

### B. NorthWest Did Not Violate Express Provisions of its Own Written Personnel Policy

Golden also contends that his termination was wrongful pursuant to

Montana Code Annotated § 39-2-904(1)(c), because NorthWestern violated

express provisions of its own written personnel policy. The Employee Discipline

Policy in effect at the time of Golden's termination included the following

provision, which Golden cites as the basis for this argument:

B.    The following steps must be followed in all cases of discipline under this Policy:

    1.    Human resources must be contacted:

        a.    In situations where a formal investigation process may reasonably be perceived as warranted, and

        b.     Prior to delivering any disciplinary action.

    2.    Supervisors and the human resources generalist should work together in determining the appropriateness of, and approach to address, any disciplinary actions.

Pursuant to this policy, HR representative Jennifer Rangitsch developed a plan

that included the following language: "Allow for due process so that Tony may provide a legitimate explanation with regard to his actions as they relate to the findings of the investigation." (Doc. 25-11 at 3.) The crux of Golden's argument is that NorthWestern failed to provide "due process," and thus violated its own written personnel policy. The Court finds this argument unconvincing on three levels.

First, Golden does not actually allege that NorthWestern violated the "express provisions" of the "written personnel policy" quoted above. Instead, he claims that the company did not act in conformity with the specific plan Rangitsch developed to address this situation pursuant to that written policy. Golden offers no support for such an extension of the express language of § 39-2-904(1)(c) to cover such plans, which do not appear to fall into the rather narrow category of "express provisions" of NorthWestern's "written personnel policy."

However, even if the statutory language covered violations of case-specific plans like the one Rangitsch developed, Golden overstates the meaning of the term "due process" and its requirements in this situation. Golden essentially argues that because NorthWestern used the term "due process," he implicitly became entitled to the same pre-termination Constitutional due process afforded to tenured public employees by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

This leap is simply too great, given the requirement that the policy be "express" and "written" in order for an employee to have a colorable cause of action for wrongful discharge. Furthermore, such incidental use of the term "due process" by a private party does not create a Constitutional right or cause of action. Quite simply, as an employee of a private corporation, Golden is not entitled to *Loudermill*'s due process requirements.

Finally, even if the *Loudermill* standard was applicable here, it is clear that NorthWestern provided sufficient due process. In *Gilbert v. Homar*, the Supreme Court clarified the *Loudermill* standard, stating that "a public employee dismissible only for cause [is] entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing." 520 U.S. 924, 929 (1997). This hearing "need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Id.* NorthWestern held a termination meeting where Golden was presented with the company's investigative findings, and was provided an opportunity to dispute those findings. He was afforded approximately 15 minutes to review the findings, gather his thoughts, and provide any contradictory information. Furthermore, Golden was provided with an appeal process conducted by a committee comprised of five NorthWestern officers, three

of whom Golden selected. The committee upheld Golden's termination after he failed to provide information to contradict the findings upon which his termination was based. This process satisfies *Loudermill*'s due process standard as clarified by *Gilbert*.

While Golden is clearly not satisfied with NorthWestern's decision to terminate him or the process it used to reach that decision, he has failed to offer any evidence that NorthWestern violated any of the express provisions of its written personnel policy.

## IV. Conclusion

NorthWestern dismissed Golden for conducting personal business at work using company equipment, and for using his company email and computer to receive, store, and transmit pornography in violation of company policy. Under the facts of this case, each basis constitutes good cause under the WDEA, and the combination of the two lends even more support to NorthWestern's position.

In addition, Golden has failed to present any evidence that NorthWestern violated the express provisions of its own written personnel policy.

Golden has not presented any genuine issues of material fact, and NorthWestern is entitled to summary judgment on Golden's WDEA claims. Accordingly,

IT IS ORDERED that NorthWestern's motion for summary judgment (Doc. 23) is GRANTED. This case is DISMISSED. All pending motions are DENIED as moot, and all dates and deadlines in this case are VACATED.

Dated this 1st day of April, 2014.

Dana L. Christensen, Chief District Judge
United States District Court